# EXHIBIT C

**NEIL L. JULIE, M.D.**
Neil Julie, M.D., P.A.
15225 Shady Grove Road # 103
Rockville, MD  20850
(301) 987-0020

---

1/10/18

JUSTINO VARGAS

## Supplemental report

Mr Beasley,

I., Neil Julie M.D., have reviewed additional records in the case of Mr. Vargas. As a result of that review I am submitting the supplement. The additional records are as follows:

1. Milton S. Hershey Medical Center Records
2. Mecklenberg EMS
3. Carolinas Medical Center
4. Death Certificate
5. Mecklenburg Medical Examiners Report
6. Mecklenburg Medical Examiners Toxicology Report
7. York Pathology Associates
8. GI Associates of St. Augustine
9. Jawad S. Farhat, M.D./Medical Professionals of North East Florida
10. Deposition transcript of Amy Welch, M.D. dated 05/10/17
11. Deposition transcript of Daniel Lotner, M.D. dated 05/19/17
12. Deposition transcript of Isabel J. Brea, M.D. dated 07/10/17
13. Deposition transcript of Charles E. Dye, M.D. taken 06/13/17
14. Deposition transcript of Simon Mucha, M.D. taken 06/29/17
15. Deposition transcript of Joanna Vargas taken 07/07/17
16. Aerospace Medical Association Guidelines, dated 05/2003

To briefly summarize based on this additional information, this patient presented by ambulance to Penn State Hershey Medical Center emergency room on December 2 in hemorrhagic shock. Systolic blood pressure was 60 and the patient was tachycardic. Both the emergency room physician, Dr Brea and the admitting hospitalist Dr. Mucha noted diverticulosis with hemorrhage at the top of their differential diagnoses.

Nonetheless, subsequently the gastroenterology fellow and the GI attending Dr. Dye mis-attributed this largely acute bleed to be from 2 small gastric ulcers with clean bases. {My review of the color photographs showed these lesions to have been little more than ulcerations from NSAIDs}

-2-

As a result of this misdiagnoses, the risk for rebleeding stated by these doctors was "low-risk" As a result the patient was discharged prematurely. He had his colonoscopy at 2:30PM on 12/2, and was discharged to go to the airport and board a flight towards Florida at 1:30PM on 12/3. The actions by the wife in contacting the airline to explore arranging new flights and the alleged texts sent to her by her husband show that in reality they did not insist on discharge but simply deferred to the decisions of the doctors. No AMA (against medical advice) form was requested by the physicians.(In his deposition, Dr Dye concedes " I think that discharging Mr Vargas on December 3 was within an acceptable standard of care" [pg 51 line 7 ] ) Staff at the hospital outlined and instructed the patient and his wife on an outpatient follow-up plan.

As a result of this incorrect diagnosis and discharge plan, the couple ill-advisedly boarded the plane to Florida. During the flight, the patient experienced an acute rebleed with profuse rectal bleeding , exsanguination and even intraperitoneal bleeding. With insufficient access to emergency medical care while flying at an altitude of greater than 20,000 feet, the patient was not adequately resuscitated. Upon landing he was in a preterminal state and expired within a few hours of arriving at the diversion airport in Charlotte, North Carolina.

Deposition testimony does not dispute that the patient was misdiagnosed as to the source of the bleeding. This resulted in an incorrect assumption as to the risk of rebleeding.
Based on the testimony of the wife, which is not rebutted by any of the doctors directly, it appears that the doctors did not adequately advise the patient that it was extremely and excessively risky to fly so soon after such a significant bleed of uncertain origin.

It has been determined that "intestinal gas will expand at a rate of 25% by volume at 8000 feet" altitude. (ASMA, 2438m). The increase in pressure can cause stretching of the mucosa and so therefore, logically it can increase bleeding risks for anyone with intestinal weaknesses like diverticulitis or ulcers.

Also it is this phenomenon that in my opinion explains how a liter of blood was then found in the peritoneal cavity at autopsy after his fatal rebleed.

I reaffirm that it was not within the standard of care to discharge a patient with this major bleed so prematurely, particularly when the health care providers knew that Mr. Vargas was to board a flight to Florida. Flying for hours on the 3rd greatly enhanced the patient's risk.

-3-

It is common knowledge that NSAIDs increase risk of diverticular bleeding- not just UGI bleeding. (Strate, Lisa et al. Gastroenterology 2011 May; 140(5): 1427-1433). The failure to diagnose the colonic source had fatal consequences.

Had the patient remained on the ground and in the hospital until such time as it was safe for him to board a plane, he clearly would have survived with minimal morbidity. Had he left the hospital but remained on the ground. his outcome would also have been substantially better than the fatal outcome that did unfortunately await him as he entered the airport gate. Put another way, the failure to properly diagnose Mr. Vargas' source of bleeding, and then permit Mr. Vargas to board a long flight so soon after a substantial GI bleed, was below the standard of care and substantially increased the risk of harm, and death.

All of my opinions are stated to a reasonable degree of medical certainty. However I reserve the right to modify these opinions based on any additional information or testimony which may be forthcoming.

Neil Julie , MD