**Cited**
As of: March 14, 2018 6:39 PM Z

# Leblanc v. Willis

Common Pleas Court of Lehigh County, Pennsylvania, Civil Division

June 27, 2012, Decided; June 27, 2012, Filed

No. 2008-C-6324 (consol. with No.2010-C-0616), No. 2010-C-0616 (consol. with No.2008-C-6234)

**Reporter**
2012 Pa. Dist. & Cnty. Dec. LEXIS 310 *

JASON G. LEBLANC as Administrator of the Estate of SARAH M. LEBLANC, Deceased, and in his own right, Plaintiff, v. JOHNNIE SPRINGS WILLIS, M.D.; KRISTIN ABBRUZZI, D.O.; A WOMAN'S PLACE OBSTETRICS & GYNECOLOGY; ST. LUKE'S HOSPITAL - BETHLEHEM CAMPUS; ST. LUKE'S HOSPITAL & HEALTH NETWORK; ST. LUKE'S HEALTH NETWORK, INC.; ST. LUKE'S PHYSICIAN GROUP; POOJA GUPTA, M.D.; JAMI AVELLINI, M.D.; DAVID E. WIAND, D.O.; RICARDO AGUIRRE-ALVARADO, M.D.; EMILY LYNNE ROGERSON, D.O.; MOHAMED A. TURKI, M.D.; ST. LUKE'S PULMONARY ASSOCIATES; THONG P. LE, M.D.; BETHLEHEM INFECTIOUS DISEASES ASSOCIATES; REBECCA M. PEQUENO, M.D.; ST. LUKE'S EMERGENCY CARE SPECIALISTS, Defendants.PAUL SCHMIT, MARION SCHMIT, and ADAM SCHMIT, in their own right, Plaintiffs, v. JOHNNIE SPRINGS WILLIS, M.D.; KRISTIN ABBRUZZI, D.O.; A WOMAN'S PLACE OBSTETRICS & GYNECOLOGY; ST. LUKE'S HOSPITAL - BETHLEHEM CAMPUS; ST. LUKE'S HOSPITAL & HEALTH NETWORK; ST. LUKE'S HEALTH NETWORK, INC.; ST. LUKE'S PHYSICIAN GROUP; POOJA GUPTA, M.D.; JAMI AVELLINI, M.D.; DAVID E. WIAND, D.O.; RICARDO AGUIRRE-ALVARADO, M.D.; EMILY LYNNE ROGERSON, D.O.; MOHAMED A. TURKI, M.D.; ST. LUKE'S PULMONARY ASSOCIATES; THONG P. LE, M.D.; BETHLEHEM INFECTIOUS DISEASES ASSOCIATES; REBECCA M. PEQUENO, M.D.; ST. LUKE'S EMERGENCY CARE SPECIALISTS, Defendants.

## Core Terms

negligent infliction of emotional distress, traumatic, pain, traumatic event, observance, witnessed, summary judgment, contemporaneous, healthcare, loved, Plaintiffs', antibiotics, omission, blood, inflict injury, infliction, discrete, signs, emotional distress, family member, medication, emotional, provider, arrived, severe, shock, light most favorable, emergency room, accompanied, personnel

## Case Summary

### Overview
A patient who delivered a baby had an infection that was not properly treated, and she ultimately died. Family members of the deceased patient brought claims of negligent infliction of emotional distress against healthcare professionals (HCPs) and related others, based on their alleged acts of omission. In resolving the HCPs' summary judgment motions, the court noted that the HCPs engaged in a good-faith, even if wholly erroneous, attempt to treat the patient. Accordingly, there was no discrete traumatic event as required under the case law to support an actionable claim.

### Outcome
Motions granted. Complaint dismissed with prejudice.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

**HN1**[ ]  **Summary Judgment, Entitlement as Matter of Law**

Summary judgment is, of course, only appropriate when the record clearly shows that there is no genuine issue of material fact and that a moving party is entitled to judgment as a matter of law. In passing upon the motion, a court is obligated to view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material

fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

Evidence > Burdens of Proof > Allocation

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Elements

### HN2[ ] Burdens of Proof, Allocation

The Pennsylvania Supreme Court abandoned the zone-of-danger requirement for claims of negligent infliction of emotional distress, stating that the zone of danger requirement can be unnecessarily restrictive and prevent recovery in instances where there is no sound policy basis supporting such a result. The Court adopted a three-prong requirement. Under that test, a plaintiff claiming negligent infliction of emotional distress may recover when the evidence suffices to satisfy the following criteria: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it; (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

Evidence > Burdens of Proof > Allocation

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

### HN3[ ] Burdens of Proof, Allocation

For purposes of a claim of negligent infliction of emotional distress, the gravamen of the observance requirement is clearly that the plaintiff in a negligent infliction case must have observed the traumatic infliction of injury on his or her close relative at the hands of the defendant. The Pennsylvania Supreme Court has drawn a line between cases involving observation of a traumatic event which has an immediate impact on the plaintiff and those not involving the observation of a traumatic event and where there is some separateness between the negligence of the defendant and its ultimate impact on the plaintiff. The Court's intent has clearly been to limit recovery for negligent infliction of emotional distress to those situations where the plaintiff suffers a direct harm of his or her own as a result of the defendant's conduct, and to find that this harm has been experienced only where the plaintiff has been directly and traumatically impacted by the defendant's tortious conduct. To recover the plaintiff must have observed the defendant traumatically inflicting the harm on the plaintiff's relative, with no buffer of time or space to soften the blow. Lower courts have consistently followed the Supreme Court in so limiting recovery for negligent infliction.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

### HN4[ ] Negligent Infliction of Emotional Distress, Potential Plaintiffs

There are certainly circumstances where an omission might be construed as a traumatic infliction of injury on a plaintiff's relative and, if the plaintiff observed that occurrence, recovery could be had under a claim of negligent infliction of emotional distress.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

### HN5[ ] Negligent Infliction of Emotional Distress, Potential Plaintiffs

While a refusal to treat may give rise to a "traumatic event with immediate impact," a concerted attempt to treat through surgical intervention coupled with good-faith reassurances simply does not equate to a traumatic infliction of harm so as to bring a matter within the category of cases asserting negligent infliction of emotional distress contemplated in the healthcare setting.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

### HN6[ ] Negligent Infliction of Emotional Distress,

Janene Druck

Case 1:16-cv-01657-YK   Document 31-4   Filed 03/19/18   Page 3 of 10   Page 3 of 10

2012 Pa. Dist. & Cnty. Dec. LEXIS 310, *310

**Potential Plaintiffs**

The degree to which an event might fairly be characterized as an "accident scene" delivering the "shock" from direct emotional impact on plaintiff as a result of an immediate and contemporaneous sensory perception, so as to satisfy the precedential criteria, is a relevant inquiry with respect to a claim of negligent infliction of emotional distress. Although there can be no gainsaying that watching a loved one suffer and ultimately die in any healthcare setting is deeply disturbing, the notion of an "accident" connotes something different and apart from the observation of suffering alone; it necessitates a characteristic of unpredictability. A violent automobile crash or some similar singular, unexpected mishap in which a family member perishes certainly suffices. Similarly, an instance of a blatant refusal to provide treatment accompanied by the observation of a loved one's misery also qualifies under the decisional law.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

**HN7**[ ] **Negligent Infliction of Emotional Distress, Potential Plaintiffs**

For purposes of negligent infliction of emotional distress, the ravages of disease or insidious bacteria taking their toll on the human body do not possess the same abrupt, fortuitous, and unexpected quality as does a sudden accident. And although for any given loved one, watching a close family member painfully succumb to a tortuous disease may, in the final analysis, be just as, or even more, grievous than watching one come to a relatively painless demise in a sudden and unexpected crash or explosion, it is that very suddenness - "with no buffer of time or space to soften the blow" - upon which the common law has conditioned recovery. In that respect, an immediate awareness that negligence or wrongful conduct is occurring may, in fact, render a particular event much more traumatic, just as a loved one who incurs a refusal of treatment for his or her family member can more readily perceive a "traumatic event with immediate impact."

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Elements

Torts > ... > Elements > Causation > General Overview

**HN8**[ ] **Negligent Infliction of Emotional Distress, Elements**

In order for liability to exist and recovery to be permitted for a claim of negligent infliction of emotional distress, there must be more than a factual or "but-for" causal relationship between a defendant's conduct and a plaintiff's injury; as a threshold matter, there must exist a duty recognized by law. The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or others within the range of apprehension.

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Potential Plaintiffs

**HN9**[ ] **Negligent Infliction of Emotional Distress, Potential Plaintiffs**

As duty presents a question of law, it is thus for the courts in their nomothetic role to demarcate the perimeters that define to whom and under what circumstances liability will attach with respect to a claim of negligent infliction of emotional distress. And it may well be that after all is said and done, duty is only a word with which courts state their conclusion that there is or is not to be liability. However, cognizant that a healthcare provider obviously apprehends the risk to his or her patient but not necessarily to others who might observe that patient and the consequences of treatment outcomes, Pennsylvania appellate courts understandably have been circumspect in extending the range of potential plaintiffs who may recover for negligent infliction of emotional distress. Accordingly, the boundary line of a healthcare provider's duty has, in keeping with sound considerations of policy, history, ideas of morals and justice, the convenience and administration of the rule, and social ideas as to where the loss should fall, confined recovery for such harm to those circumstances in which a plaintiff has observed the defendant traumatically inflicting harm on the plaintiff's relative with no buffer of time or space to soften the blow.

**Counsel:** **[*1]** Shanin Specter, Esq., and Lisa S. Dagostino, Esq., KLINE & SPECTER, Philadelphia, PA, On behalf of Plaintiffs.

Case 1:16-cv-01657-YK Document 31-4 Filed 03/19/18 Page 4 of 10 Page 4 of 10

2012 Pa. Dist. & Cnty. Dec. LEXIS 310, *1

Arthur W. Hankin, Esq., Mark R. Zolfaghari, Esq., and Shira K. Roemer, Esq., BLANK ROME LLP, Philadelphia, PA, On behalf of Defendants St. Luke's Hospital of Bethlehem, Pennsylvania (d/b/a St. Luke's Hospital Bethlehem Campus and d/b/a St. Luke's Hospital and Health Network); St, Luke's Health Network, Inc.; St. Luke's Physician Group, Inc. (d/b/a St. Luke's Pulmonary Associates and d/b/a St. Luke's Emergency Care Specialists); Pooja Goopta, M.D.; Jami Avellini, M.D.; David E. Wiand, D.O.; Ricardo Aguirre-Alvarado, M.D.; Emily Lynne Rogerson, D.O.; Mohamed A. Turki, M.D.; Thong P. Le, M.D.; Rebecca Pequeno, M.D.; and Bethlehem Infectious Diseases Associates.

Candy Barr Heimbach, Esq., and Michelle L. Wilson, Esq., MARSHALL, DENNEHEY, WARNER, COLEMAN AND GOGGIN, Bethlehem, PA, On behalf of Defendants Johnnie S. Willis, M.D.; Kristen Abbruzzi, D.O.; and A Woman's Place Obstetrics & Gynecology.

**Judges:** EDWARD D. REIBMAN, J.

**Opinion by:** EDWARD D. REIBMAN

# Opinion

### ORDER

AND NOW, this 27th day of June, 2012, upon consideration of Defendants' motions for summary judgment, filed on August 9, 2011, and August 18, 2011, [*2] and Plaintiffs' responses thereto, filed on September 6, 2011, and September 14, 2011, and after argument held on December 7, 2011, and for the reasons set forth in the accompanying opinion,

IT IS ORDERED that said motions are GRANTED.

IT IS FURTHER ORDERED that summary judgment is hereby entered in favor of Defendants and against Plaintiffs in the above-captioned matter at No. 2010-C-0616 and Plaintiffs' complaint is hereby dismissed with prejudice.

IT IS FURTHER ORDERED that partial summary judgment is entered in favor of Defendants at No. 2008-C-6234 and all of Plaintiffs' claims for recovery based on allegations of negligent infliction of emotional distress are hereby dismissed with prejudice.

BY THE COURT:

/s/ Edward D. Reibman

EDWARD D. REIBMAN, J.

**Reibman, J**.

In these consolidated actions, Plaintiff Jason LeBlanc, husband of the decedent Sarah LeBlanc, along with Ms. LeBlanc's mother, Plaintiff Marion Schmit; her father, Plaintiff Paul Schmit; and her brother, Plaintiff Adam Schmit, have brought suit, seeking to recover damages allegedly resulting from, among other things, negligent infliction of emotional distress based on the alleged acts of omission by Defendants, who provided healthcare [*3] to Ms. LeBlanc. Arguing that the facts of record will not sustain such claims in this matter, Defendants now move for summary judgment against the Schmits and partial summary judgment against Plaintiff Jason LeBlanc on the negligent-infliction-of-emotional-distress claims set forth in their complaints. For reasons that follow, the motions will be granted.

I.

*HN1*[↑] Summary judgment is, of course, only appropriate "when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Englert v. Fazio Mechanical Services. Inc., 2007 PA Super 233, 932 A.2d 122, 123 (Pa.Super. 2007)*. In passing upon the motion, the court is obligated to "view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party." Ibid. "Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment." Ibid.

The facts viewed in the light most favorable to the Plaintiffs are as follows. Sarah LeBlanc presented to Defendant St, Luke's Hospital ("St. Luke's") on the afternoon of May 30, 2008, under the care [*4] of her obstetrician, Defendant Johnnie Willis, M.D., to deliver her baby. In the course of that vaginal delivery, attended by Dr. Willis and a resident physician, Defendant Jami Avellini, M.D., Ms. LeBlanc incurred a laceration on her perineum. Dr. Avellini repaired the laceration under the direction of Dr. Willis, while Ms. LeBlanc's husband, Plaintiff Jason LeBlanc, and her mother, Plaintiff Marion Schmit, observed.

Almost immediately after being transferred to the post-partum floor, Ms. LeBlanc began complaining of severe vaginal and perineal pain; however, no St. Luke's personnel examined her wound. By the morning of May 31, 2008, Ms. LeBlanc's blood count revealed an

elevated level of white blood cells. Although that lab result along with continuing complaints of pain were noted in her chart, no physician, including Dr. Willis, examined here perineum or ordered any follow-up blood work.

The following day, June 1, 2008, Ms. LeBlanc continued to complain of pain in her perineum, but still no physical examination of her wound was performed. Instead, she was administered pain medication, analgesic spray and cold compresses. (See Pls. Brf at 4.) Jason LeBlanc accompanied his wife throughout **[*5]** this stay in the postpartum ward. Ms. LeBlanc was also accompanied by her mother who witnessed her repeated complaints about her perineal pain. (Id. at 5-6). Later that day, Dr. Willis discharged Ms. LeBlanc, and she returned to her home without ever having her repaired perineal wound examined. (Id. at 6.) She continued to experience severe pain and took Darvocet and prescription strength Ibuprofen in an attempt to alleviate her discomfort. Again, both her husband and her mother bore witness to Ms. LeBlanc's distress.

By the following morning on June 2, 2008, the pain continued and was now accompanied by chills and nausea. Ms. LeBlanc phoned both St. Luke's and Dr. Willis' office, seeking guidance. She informed Dr. Wills of the increasing level of pain as well as the chills and nausea. Dr. Willis advised her to increase her pain medication, but did not recommend that Ms. LeBlanc be seen for an evaluation. (Id. at 9.)

Notwithstanding the recommendation to increase her dosage levels, Ms. LeBlanc's pain continued to worsen and as of the early morning hours on June 3, 2008, she was also feeling weak and had begun vomiting. She again phoned Dr. Willis, who advised her to continue pain medication **[*6]** and to come to his office if her symptoms did not improve within six hours. (Id. at 10.) Approximately a half an hour after that phone call, Ms. LeBlanc and her husband decided to proceed to Dr. Willis' office rather than wait out the full six hours as suggested. However, as Mr. LeBlanc was assisting his wife to their car, she passed out, Mr. LeBlanc yelled out for help, a neighbor dialed 911, and an ambulance arrived to transport Ms. LeBlanc to St. Luke's. (Id. at 11.)

Ms. LeBlanc attempted without success to reach Dr. Willis by telephone during her ambulance ride. She arrived at St. Luke's Emergency Department at 10:44 a.m. and was moved into an examination room shortly after 11:00 a.m., coming under the care of Defendant Rebecca Pequeno, M.D., the attending physician, and Defendant David Wiand, D.O., a resident physician. (Id. at 12.) Mr. LeBlanc accompanied his wife in the emergency room as she continued to experience severe pain and again fainted. Her vital signs indicated a low blood pressure of 63/38, an elevated pulse of 137, and a diminished oxygen-saturation level of 91%. Her blood chemistry revealed signs of what Plaintiff's experts now interpret as indicators of a severe **[*7]** infection, including a highly elevated white-blood-cell count. At approximately 1:00 p.m., after her mother, Plaintiff Marion Schmit had arrived, Ms. LeBlanc was examined by Defendant Ricardo Aguirre-Alvarado, M.D., who noted severe swelling and discharge from her vaginal region. (Id. at 15.) Ms. LeBlanc's father, Paul Schmit, also had arrived and observed his daughter in discomfort. (Ibid.)

Administration of antibiotics began at 1:53 p.m. Plaintiffs' experts opine, however, that the so-called "broad-spectrum" antibiotic given at this time provided inadequate coverage for the "gram negative" and anaerobic bacteria that would turn out to be the source of the infection. Dr. Wiand evidently had ordered an antibiotic, Meropenem to be given in conjunction with Vancomycin, to cover that latter category of organisms; however, due to an apparent computer glitch, St. Luke's pharmacy never received the order and, consequently, the medicine was not delivered or administered. (Id. at 17.) Plaintiffs' experts find fault not only with the failure to timely provide antibiotics for the gram-negative bacteria, which would not be given until later that evening, but also in the delay beyond 12:30 p.m. **[*8]** in ordering the administration of any antibiotics, (Id. at 18-19.)

At approximately 2:30 p.m., Dr. Willis arrived and examined Ms. LeBlanc. (Id. at 19.) Despite administration of pain medication, Ms. LeBlanc experienced extreme pain in the course of a vaginal examination. Dr. Willis then informed Mr. LeBlanc of the need to perform minor surgery on his wife and at 2:47 p.m., she was transported to the operating room to have the perineal wound drained and packed. While en route to the operating room, Mrs. Schmit inquired as to the status of her daughter's antibiotics and was assured that they would be given. (Id. at 20-21.) Although the operative notes indicate that an incision and drainage of Ms. LeBlanc's infected laceration was performed by Defendants Willis and Aguirre-Alvarado, no damaged tissue was removed and no "wide resection" of the wound was performed. Plaintiff's experts opine that the failure to perform these measures represented another

Case 1:16-cv-01657-YK   Document 31-4   Filed 03/19/18   Page 6 of 10

Page 6 of 10

2012 Pa. Dist. & Cnty. Dec. LEXIS 310, *8

deviation from the standard of care. (Id. at 21.)

After surgery, Ms. LeBlanc was transported to the post-anesthesia care unit at approximately 3:35 p.m. At that time, Dr. Willis reassured Mr. LeBlanc and Mrs. Schmit that although Ms. LeBlanc [*9] was "going to feel a lot of pain . . she's going to be okay." (Id. at 22) Mr. LeBlanc would later testify at deposition that the ultimate inaccuracy of that prognosis "is something that haunts [him] every day" and is "something that contributes to [his] post traumatic stress disorder in a major way." (Ibid.)

Upon completing the surgery, Dr. Aguirre-Alvarado discontinued the, as-yet unfilled, order for Meropenum and Vanomycin, and prescribed the antibiotics, gentamicin and clindamycin. But in still another breach of the standard of care, he did not order that these medications be administered immediately, or "Stat." Consequently, Ms. LeBlanc did not receive any antibiotic covering gram-negative and anaerobic bacteria until 7:49 p.m., approximately eight hours after her admission. (Id. at 24.) Meanwhile, at about 4:50 p.m., Ms. LeBlanc was moved from the post-surgery recovery room to the Medical Intensive Care Unit. She continued to be in discomfort in the company of her husband and her mother and father. (Id. at 25.) However, Drs. Abruzzi and Willis reassured Ms. LeBlanc and her family that she was doing well and would recover.

At 8:00 that evening, Defendant Emily Lynn Rogerson, D.O., [*10] the hospital's obstetrics chief resident, noted a significantly decreased urine output. However, at this point, neither Dr. Rogerson nor Dr. Willis, with whom she consulted by phone, nor Dr. Abruzzi, who saw Ms. LeBlanc at 8:56 p.m., ordered a critical-care consultation, despite the low urine output and other vital signs indicative of septic shock, including low temperature, rapid heart rate, and low blood pressure. (Id. at 27.) At approximately 9:00 p.m., Ms. LeBlanc was seen by Defendant Thong Le, M.D., an infectious disease specialist, who also failed to recognize these symptoms as signs of septic shock. (Ibid.)

By 12:30 a.m. on June 4, Dr. Rogerson continued to note the lack of urine output and, after consultation with Dr. Willis, ordered administration of additional fluids and a diuretic. Despite continuing deterioration in her urine output and poor vital signs, indicative of septic shock and kidney failure, no critical care consult was ordered. Ms. LeBlanc was next seen at 4:52 a.m. by Dr. Moti Lai Vishwakarma under the direction of Defendant Mohamed Turki. Dr. Turki, too, failed to diagnose septic shock and renal failure notwithstanding the cessation of urine output after 4:00 [*11] a.m. despite ongoing administration of fluids. (Id. at 28.)

As of the seven o-clock hour on the morning of June 4, 2008, Ms. LeBlanc had taken on approximately eleven liters of fluid that she had not passed; continued to display poor vital signs, including low blood pressure and low levels of oxygen saturation; had begun demonstrating a severely abnormal pH in her arterial blood gas; and exhibited visible signs of poor perfusion including mottled skin on the lower half of her body as well as blue mottled hands. (Id. at 29.) Although, according to Plaintiffs' experts, intubation should have been performed to protect Ms. LeBlanc's airway in response to these signals, none of her physicians took that step.

Upon returning to the hospital later that morning on June 4, Mr. LeBlanc and Ms. LeBlanc's brother, Plaintiff Adam Schmit, were each startled by her bloated appearance. (Id. at 30.) Nevertheless, Dr. Le advised both men that although Ms. LeBlanc was very sick, she would "pull through" and would be able to go home in approximately five days. (Id. at 31-32.) After Dr. Le left the hospital room, however, Ms. LeBlanc emitted a choking sound and became unresponsive. A "code blue" was called [*12] and a team of personnel responded. Although hospital staff attempted to remove Mr. LeBlanc from the room, he refused to comply, and thus witnessed resuscitative attempts being performed by Dr. Turki. (Id. at 34.) Mr. and Mrs. Schmit arrived at this time and they, too, observed what Mr. Schmit described as "somebody on top of [Ms. LeBlanc] doing CPR." As Mrs. Schmit explained, she struggled with hospital personnel in order to make her way to Ms. LeBlanc's bedside while CPR was being performed, before she and her husband were finally pulled away and escorted from the room. (Id. at 35-36). Ms. LeBlanc was pronounced dead at 12:45 p.m.

In addition to the claims for wrongful death and the survival action being brought on behalf of the estate, Ms. LeBlanc's husband, brother, and parents seek to recover in their own right under a theory of negligent infliction of emotional distress. They contend that they all contemporaneously observed the negligent omissions of Ms. LeBlanc's healthcare providers and her resultant suffering. Accordingly, they maintain that they fall within the category of plaintiffs eligible to recover such damages. The defendants, however, have moved for summary judgment, [*13] arguing that the

Case 1:16-cv-01657-YK   Document 31-4   Filed 03/19/18   Page 7 of 10

Page 7 of 10

2012 Pa. Dist. & Cnty. Dec. LEXIS 310, *13

alleged omissions at issue in this case and the events witnessed by the plaintiffs do not suffice to state a claim for negligent infliction of emotional distress under the decisional law of this Commonwealth.

II.

Earlier in the course of overruling demurrers in these companion cases, this court acknowledged the evolution of the doctrine of negligent infliction of emotional distress in Pennsylvania, noting that in *Niederman v. Brodsky, 436 Pa. 401, 261 A.2d 84 (1970)*, our Supreme Court abandoned the so-called "impact rule." Prior to Niederman, there could be no recovery for negligent infliction of emotional distress "in the absence of contemporaneous impact." However, in that case, the Court adopted what came to be known as a "zone of danger" requirement, and held that the plaintiff had sufficiently stated a claim through a complaint alleging "that the negligent force was aimed at him and put him in personal danger of physical impact, and that he actually did fear the force[.]" *Id. at 90*.

Thereafter, in *Sinn v. Burd, 486 Pa. 146, 404 A.2d 672 (1979)*, **HN2**[↑] the Supreme Court abandoned the zone-of-danger requirement, stating that "since the Neiderman decision, experience has taught [*14] us that the zone of danger requirement can be unnecessarily restrictive and prevent recovery in instances where there is no sound policy basis supporting such a result." *Id. at 677*. Allowing recovery for a plaintiff who incurred emotional distress when she witnessed her daughter being struck and killed by an automobile, the court adopted the three-prong requirement articulated by the California Supreme Court in *Dillon v. Legg, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (Cal. 1968)*. Under that test, a plaintiff claiming negligent infliction of emotional distress may recover when the evidence suffices to satisfy the following criteria:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Id. at 685* (citing *Dillon*, 441 P.2d at 920).

As also noted in the earlier opinion overruling [*15] preliminary objections in this case, the Superior Court has on several occasions addressed claims of negligent infliction of emotional distress alleged to have resulted from medical malpractice. For instance, in *Tackett v. Encke, 353 Pa. Super. 349, 509 A.2d 1310 (Pa.Super. 1986)*, the plaintiff's son received treatment following a motorcycle accident. The plaintiff alleged that as a result of the healthcare providers' failure to render an accurate diagnosis, the son had to be placed on an artificial respirator and further suffered a comatose episode before recovering, all of which was witnessed by the plaintiff on a daily basis. Ibid. The Superior Court refused to allow recovery for emotional distress, finding that the plaintiff's claim did not meet Sinn's requirement that a plaintiff witness a "discrete and identifiable traumatic event." Ibid. Likewise in *Halliday v. Beltz, 356 Pa. Super. 375, 514 A.2d 906, 908 (Pa.Super. 1986)*, the plaintiffs' complaint failed to satisfy the requirement of a "'sensory and contemporaneous observance of the accident' or the personal observation requirements of Pennsylvania case law" [*16] in a case in which the plaintiffs admitted they did not witness the surgery that led to the decedent's death.

In still another case, the Superior Court found that a claim for negligent infliction of emotional distress not to be sufficiently pled where the plaintiff did allege that he witnessed the injurious results of defendants' negligence but did not aver that he witnessed the negligence of the defendants, which consisted only of a failure to act. *Bloom v. Dubois Regional Medical Center, 409 Pa. Super. 83, 597 A.2d 671, 673 (Pa.Super. 1991)*. Specifically in that case the plaintiff alleged that after his wife had been admitted to the psychiatric unit of the defendant hospital, he found her suspended by the neck in the midst of an attempted suicide. Denying relief, the Court explained:

> **HN3**[↑] ... The gravamen of the observance requirement is clearly that the plaintiff in a negligent infliction case must have observed **the traumatic infliction of injury** on his or her close relative **at the hands of the defendant**. The Supreme Court has drawn a line between cases involving **observation of a traumatic event which has an immediate impact** on the plaintiff and **those not involving the observation of a traumatic event and [*17] where there is some separateness between the negligence of the defendant and its ultimate impact on the plaintiff**. The court's intent has clearly been to limit recovery for negligent

infliction of emotional distress to those situations where the plaintiff suffers a direct harm of his or her own as a result of the defendant's conduct, and to find that this harm has been experienced only where the plaintiff has been directly and traumatically impacted by the defendant's tortious conduct. To recover the ***plaintiff must have observed the defendant traumatically inflicting the harm on the plaintiff's relative, with no buffer of time or space to soften the blow***.

This court has consistently followed the Supreme Court in so limiting recovery for negligent infliction. We have, for example, denied recovery to a plaintiff who allegedly experienced emotional distress in watching the slow progression of a horrible disease suffered by a close relative allegedly because of acts by the defendants which the plaintiff did not contemporaneously observe and which caused no single identifiable traumatic event that the plaintiff could observe. See *Cathcart v. Keene Industrial Insulation, 324 Pa.Super. 123, 471 A.2d 493 (1984)*. **[*18]** Similarly, we denied recovery to plaintiffs who watched the suffering of a relative who had allegedly been injured by acts of medical malpractice which the plaintiffs did not contemporaneously observe. *Halliday v. Beltz, supra.* In each such case, we have found a lack of a traumatic impact on the plaintiff resulting directly and contemporaneously from the observation of the traumatic infliction of injury on the plaintiff's relative at the hands of the defendant.

In light of these considerations, we conclude that to allow recovery here would be to go beyond the parameters of liability that have been established both by the Supreme Court and this court. Mr. Bloom observed his wife in the aftermath of her own suicide attempt. He did not, however, observe any traumatic infliction of injury on his wife at the hands of the defendants because none occurred. The alleged negligence of defendants here is an omission and involved no direct and traumatic infliction of injury on Mrs. Bloom by defendants. Under these circumstances, we find that Mr. Bloom has not sufficiently pleaded a cause of action for negligent infliction of emotional distress since he has not pleaded the element of contemporaneous **[*19]** observance of traumatic infliction of injury by defendants.

*Id. at 682-83* (emphasis added). See also *Sonlin v. Abington Memorial Hospital, 2000 PA Super 44, 748 A.2d, 213 (Pa.Super. 2000)* (no recovery for emotional distress where putative "discrete and identifiable traumatic event" of being informed of child's condition as a result of medical negligence was not recognizable as such an event until eight days later when child's leg amputated to remedy thrombosis caused by error).

As also noted in the previous opinion in this matter, Bloom further observed that it did not wish entirely to foreclose recovery in all cases characterized by acts of omission:

> **HN4**[↑] There are certainly circumstances where an omission might be construed as a traumatic infliction of injury on the plaintiff's relative and, if the plaintiff observed that occurrence, recovery could be had. Take, for example, the situation where a husband plaintiff seeks to admit his wife to an emergency room for medical care. Because of the inaction by the emergency room personnel, the wife is left to languish in the outer office and expires there. Husband has viewed the entire event. The omission by the emergency room personnel in this scenario might create **[*20]** a sufficiently traumatic situation to be the basis for recovery for negligent infliction.

*Id. at 683*.

Thereafter, in *Love v. Cramer, 414 Pa. Super. 231, 606 A.2d 1175 (Pa.Super. 1992)*, the Superior Court reversed the trial court's dismissal of the plaintiff's negligent infliction of emotional distress claim. There, the plaintiff researched her mother's medical problems and came to believe that they might be related to a heart condition. *Id. at 1176*. The plaintiff thus took her mother to see the defendant-doctor, who advised the plaintiff and her mother that no further testing or treatment was necessary. Ibid. Over the next six weeks, the plaintiff and her mother sought an explanation for her mother's condition, including seeing the defendant-doctor on multiple occasions. Ibid. However, the defendant-doctor never investigated the possibility of a heart condition. Ibid. The plaintiff's mother eventually died of heart failure; the plaintiff was at her side and witnessed her death. Ibid.

Adverting to the hypothetical advanced in Bloom, the Court allowed a claim of negligent infliction of emotional distress claim to go forward:

> The instant case is much like the emergency room scenario described [in Bloom]. Although **[*21]** the negligence and the injury are not as closely related

Case 1:16-cv-01657-YK Document 31-4 Filed 03/19/18 Page 9 of 10 Page 9 of 10

2012 Pa. Dist. & Cnty. Dec. LEXIS 310, *21

in time in this case, the situation is similar because of the observance of the negligent failure to treat a loved one. Here appellant took her mother to appellee because of her concerns regarding her mother's health, and was actually present when appellee failed to perform specific heart related tests on her mother. She witnessed the negligent medical care and her mother's subsequent death. It is possible that appellant will be able to prove that Dr. Cramer was negligent, and that his negligence was the proximate cause of her mother's death. Appellant's observance of the lack of medical care, along with her observance of her mother's heart attack is enough to sustain her claim for negligent infliction of emotional stress. Although appellant may be unable to ultimately prove a causal connection between her injuries and the doctor's alleged negligence, she should at least be given the opportunity to do so. This is not the simple situation wherein the plaintiff did not observe the traumatic event, but nevertheless sought to recover for emotional distress. Rather appellant witnessed the traumatic event, and the earlier negligence **[*22]** of the doctor. Her recovery, if proven, would be based upon the fact that her emotional injury was due to her first hand observation of her mother's heart attack, an event caused by Dr. Cramer's negligence, which she had also witnessed. As such, it cannot be said with certainty that appellant will be unable to recover under the law. She should be given the opportunity to prove that Dr. Cramer was negligent, and that his negligence was a proximate cause of her emotional distress. Therefore, the preliminary objection should not have been granted.

*Id.* at 1178-79.

III.

Although largely in reliance on Love, the claims in this matter were allowed to proceed beyond the pleading stage, it now appears that in full consideration of the record developed through discovery and fuller consideration of available precedent against that factual backdrop, a claim for negligent infliction of emotional distress will not lie in this case. Whereas in *Love*, there existed sufficient allegations of a *refusal* to treat so as to render that matter analogous with, the hypothetical advanced in Bloom, here the record viewed in the light most favorable to Plaintiffs evidences only a good-faith, even if wholly erroneous, **[*23]** attempt to treat their family member. And thus *HN5*[↑] while a refusal to treat may give rise to a "traumatic event with immediate impact," a concerted attempt to treat through surgical intervention coupled with good-faith reassurances, as existed here, simply does not equate to a traumatic infliction of harm so as to bring the present matter within the category of cases contemplated by *Sinn* and its progeny in the healthcare setting.

The fact that in hindsight such treatment might ultimately be viewed as little more than a concatenation of errors nevertheless cannot transform a bona fide attempt to render assistance into the sort of discrete traumatic event, analogous to an automobile accident or fire, which remains a prerequisite for recovery. By contrast, the latter category of traumatic event might readily be said to exist when a family member implores for help and, in the disregard of duty and with the foreseeable result of not only peril to the afflicted but emotional injury to the family member seeking aid, a healthcare provider merely turns a cold shoulder. Here, however, unlike the hypothetical in *Bloom* and the evidence of a refusal to treat in *Love*, the record viewed in the light most **[*24]** favorable to Plaintiffs yields no evidence of any such refusal to provide medical assistance. Instead, the record reviewed above indicates that Plaintiffs' decedent was admitted to the hospital, had surgical procedures attempted, and medications administered. The fact that those treatments, over the course of five days, proved ineffective and even deficient, does not transform this unfortunate escapade into a discrete traumatic event as required under the case law.

Further, although the parties have expended considerable effort in debating whether there need be a conscious perception that negligence has occurred, it appears that, strictly speaking and so framed, that query misstates the precise issue. Implicit in that discussion, however, is the more relevant inquiry regarding *HN6*[↑] the degree to which an event might fairly be characterized as an "accident scene" delivering the "shock" from "direct emotional impact on plaintiff as a result of an immediate and contemporaneous sensory perception, so as to satisfy the criteria articulated in *Sinn*. Although there can be no gainsaying that watching a loved one suffer and ultimately die in any healthcare setting is deeply disturbing, the notion **[*25]** of an "accident" as contemplated in *Sinn* connotes something different and apart from the observation of suffering alone; it necessitates a characteristic of unpredictability. A violent automobile crash or some similar singular, unexpected mishap in which a family member perishes, like that confronted in Sinn, certainly suffices. Similarly,

an instance of a blatant refusal to provide treatment accompanied by the observation of a loved one's misery also qualifies under the decisional law.

On the other hand, *HN7*[] the ravages of disease or insidious bacteria taking their toll on the human body do not possess the same abrupt, fortuitous, and unexpected quality as does a sudden accident. And although for any given loved one, watching a close family member painfully succumb to a tortuous disease may, in the final analysis, be just as, or even more, grievous than watching one come to a relatively painless demise in a sudden and unexpected crash or explosion, it is that very suddenness - "with no buffer of time or space to soften the blow" - upon which the common law has conditioned recovery. In that respect, an immediate awareness that negligence or wrongful conduct is occurring may, in fact, render **[*26]** a particular event much more traumatic, just as a loved one who incurs a refusal of treatment for his or her family member can more readily perceive a "traumatic event with immediate impact." In this case, however, in the course of Ms. LeBlanc's terribly unfortunate demise over the course of five days, the requisites of suddenness and fortuity in the form of a discrete event, as presently required under appellate precedent, simply are not present. Although Ms. LeBlanc's healthcare providers may have committed errors in the form of the omissions alleged, contrary to the characterizations set forth in their legal arguments, Plaintiffs "witnessed" no discrete traumatic infliction of injury chargeable to Defendants.

Finally, Plaintiffs lay great stress on the emotional harm that resulted from errors committed in the course of Ms. LeBlanc's care. However, that focus glosses over a critical distinction in the law between duty and causation. *HN8*[] In order for liability to exist and recovery to be permitted, there must be more than a factual or "but-for" causal relationship between a defendant's conduct and a plaintiff's injury; as a threshold matter, there must exist a duty recognized by law. As **[*27]** Justice Cardozo famously depicted the recognition of this duty, in language quoted with approval by the Pennsylvania Supreme Court, "'The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or others within the range of apprehension.'" See *Dahlstrom v. Shrum, 368 Pa. 423, 84 A.2d 289. 291 (Pa. 1951)* (quoting *Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928))*.

*HN9*[] As duty presents a question of law, it is thus for the courts in their nomothetic role to demarcate the perimeters that define to whom and under what circumstances liability will attach. And it may well be that after all is said and done, "'[d]uty is only a word with which we state our conclusion that there is or is not to be liability[.]'" *R.W. v. Manzek, 585 Pa. 335, 888 A2d. 740, 747 (Pa. 2005)* (quoting William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 14-15 (1953)). However, cognizant that a healthcare provider obviously apprehends the risk to his or her patient but not necessarily to others who might observe that patient and the consequences of treatment outcomes, our appellate courts understandably have been circumspect in extending the range of potential plaintiffs who may **[*28]** recover for negligent infliction of emotional distress. Accordingly, the boundary line of a healthcare provider's duty has, in keeping with sound considerations of policy, "history, our ideas of morals and justice, the convenience and administration of the rule, and our social ideas as to where the loss should fall," see *id.*, confined recovery for such harm to those circumstances in which a plaintiff has observed the defendant traumatically inflicting harm on the plaintiff's relative with no buffer of time or space to soften the blow. Here, despite the great sadness that flows from the loss of Ms. LeBlanc, that essential element is not present. Accordingly, the motions for summary judgment must be granted.

IV.

For the foregoing reasons, the record viewed in the light most favorable to Plaintiffs fails to provide evidence that Plaintiffs observed a discrete traumatic event so as to qualify for recovery under a theory of negligent infliction of emotional distress. Moving Defendants are, therefore, entitled to judgment as a matter of law and these claims will be dismissed.

DATED: June 27, 2012

/s/ Edward D. Reibman

Edward D. Reibman, J.

**End of Document**