IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNA VARGAS, | : | |
|     Plaintiff | : | No. 1:16-cv-01657 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| PENN STATE HERSHEY | : | |
| MILTON S. HERSHEY | : | |
| MEDICAL CENTER, | : | |
|     Defendant | : | |

## MEMORANDUM

Plaintiff JoAnna Vargas, as Executrix of the Estate of Justino Vargas, and on her own behalf, filed a complaint against Defendant Penn State Hershey Milton S. Hershey Medical Center ("Medical Center"), on August 10, 2016, asserting claims of negligence under Pennsylvania's Wrongful Death Act, 42 Pa. C.S. § 8301, and Survival Act, 42 Pa. C.S. § 8302, as well as a claim for negligent infliction of emotional distress, arising out of the death of Justino Vargas after his discharge from the Medical Center. (Doc. No. 1 ¶¶ 33-39, 94-99.) Before the Court is Defendant's partial motion for summary judgment as to Plaintiff's negligent infliction of emotional distress claim. (Doc. No. 27.) For the reasons that follow, the Court will grant the motion.

### I.    BACKGROUND[1]

---

[1] The following relevant facts of record, taken from the Medical Center's statement of material facts (Doc. No. 28), are undisputed unless otherwise noted. The Medical Center's statement of material facts contains specific citations to the record in numbered paragraphs. The Court notes that in opposing the Medical Center's motion for partial summary judgment, Plaintiff failed to comply with the requirements of Local Rule 56.1, which require that the "papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement" supporting the motion, "as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1. Instead, Plaintiff submitted an "Answer in Opposition" to the Medical Center's motion, which responds to the numbered paragraphs in the motion, not the statement of material facts. (Doc. No. 30.) Local Rule 56.1 provides that in the absence of such a required statement filed by the

1

Plaintiff JoAnna Vargas ("Plaintiff"), is the widow and Executrix of Justino Vargas ("Mr. Vargas"). (Doc. No. 28 ¶ 1.) At the time of the events giving rise to this action, Plaintiff and Mr. Vargas traveled from Florida to visit family in Hershey, Pennsylvania. (Id.) On December 2, 2014, Mr. Vargas began to develop bright red, moderate rectal bleeding. (Id. ¶ 3.) After having his second bowel movement, Mr. Vargas required help from his wife and sons to get off the toilet, as he told them that he felt weak and dizzy. (Id. ¶¶ 3-4.) When he got off the toilet, Plaintiff noticed large amounts of blood in the toilet bowl. (Id. ¶ 4.) Two hours after the rectal bleeding began, Mr. Vargas's family called an ambulance, which took him to the Medical Center's Emergency Department. (Id. ¶ 4.) Plaintiff arrived separately at the Medical Center. (Id. ¶ 5.) While at the Emergency Department, it was determined that Mr. Vargas had acute blood-loss anemia, and Medical Center staff inserted two large bore IVs to begin fluid resuscitation, obtained blood for testing, and ordered a CT of his abdomen. (Id. ¶ 6.)

Ultimately, Mr. Vargas was admitted to the Medical Center's internal medicine service and housed in its Intermediate Care Unit ("IMC") for close observation. (Id. ¶ 7.) After resuscitation with IV fluids, his vital signs normalized. (Id.) The Medical Center's gastroenterology service ("GI Service"), consulted on Mr. Vargas's case and planned to perform an endoscopy and colonoscopy. (Id. ¶ 8.) The GI Service's assessment of Mr. Vargas was that he had an acute GI bleed, possibly due to a bleeding diverticula,[2] or peptic ulcer disease ("PUD"), due to Mr. Vargas recently beginning a course of nonsteroidal anti-inflammatory drugs (NSAIDs). (Id.)

---

opposing party, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1. Accordingly, pursuant to Local Rule 56.1, for purposes of this motion, the Court deems admitted the facts set forth in the Medical Center's statement of material facts.

[2] Diverticula are small pouches that bulge outward through the colon, or large intestine. Mr. Vargas had a history of diverticular disease. (Id.)

In the late afternoon of December 2, 2014, Mr. Vargas underwent an endoscopy and colonoscopy to evaluate the cause of his rectal bleeding. (Id. ¶ 9.) Plaintiff was not present for performance of these tests. (Id. ¶ 10.) Plaintiff learned after the endoscopy and colonoscopy that Mr. Vargas's GI bleed was due to stomach ulcers. (Id. ¶ 11.) After the testing was complete, Plaintiff asked to see Mr. Vargas and then left the Medical Center to sleep. (Id. ¶ 12-13.) On December 3, 2014, Mr. Vargas texted Plaintiff and told her that it was possible that he might not be released from the Medical Center due to a low blood count; however, later that day, he again texted Plaintiff and this time told her that his blood count was better and that he was ready for discharge from the Medical Center. (Id. ¶¶ 14-15.) After receiving the second text from Mr. Vargas, Plaintiff returned to the Medical Center on December 3 with a family friend and picked up her husband, who was discharged. (Id. ¶¶ 16-17.) When doing so, she did not speak with any Medical Center physicians. (Id. ¶ 17.) After leaving the Medical Center, Plaintiff and Mr. Vargas went to lunch and then to the airport for a scheduled flight to return to their home in Florida. (Id. ¶ 18.)

Between the time Mr. Vargas was discharged from the Medical Center and the time of the flight, Plaintiff thought that Mr. Vargas "looked okay" and she "wasn't concerned" about his condition. (Id. ¶ 19.) Plaintiff and Mr. Vargas flew from Harrisburg to Philadelphia, where they boarded another flight to Jacksonville, Florida. (Id. ¶ 20.) During the flight from Harrisburg to Philadelphia, Mr. Vargas appeared normal. (Id.) However, during the flight from Philadelphia to Jacksonville, Mr. Vargas experienced a re-occurrence of his rectal bleeding. (Id. ¶ 21.) At that time, Plaintiff, who was seated next to him, noticed that he became unresponsive. (Id.) Ultimately, he got up to to go to the bathroom and Plaintiff witnessed a trail of blood, or "a lot of blood." (Id.) When Mr. Vargas entered the airplane bathroom, he collapsed with the door open,

3

and Plaintiff started screaming for help. (Id. ¶ 22.) Two passengers who identified themselves as medical professionals came forward and attempted to resuscitate Mr. Vargas while the plane made an emergency landing. (Id.) After the plane landed, Plaintiff and Mr. Vargas were taken to a hospital in separate ambulances, where Plaintiff learned that Mr. Vargas had passed away. (Id.¶ 23.)

On August 10, 2016, Plaintiff filed her complaint against the Medical Center in this Court. (Doc. No. 1.) After resolution of an initial motion to dismiss, the Medical Center filed its answer to the complaint on June 1, 2017. (Doc. No. 21.) After several motions for extensions of time to complete discovery, discovery closed in December 2017. The Medical Center subsequently filed this motion for partial summary judgment addressing Plaintiff's claim for negligent infliction of emotional distress with accompanying statement of material facts and a brief in support. (Doc. Nos. 27-29.) On March 9, 2018, Plaintiff filed an "Answer in Opposition to Defendant's Motion for Partial Summary Judgment" (Doc. No. 30), with several exhibits attached, including a copy of the complaint (Doc. No. 30-2), a copy of Plaintiff's deposition testimony (Doc. No. 30-3), a copy of a purported expert report (Doc. No. 30-4), and a Memorandum of Law in Opposition to Defendant's Motion (Doc. No. 30-5). As noted above, Plaintiff filed no response to the Medical Center's statement of material facts, as required by Local Rule 56.1. On March 19, 2018, the Medical Center filed its reply brief. (Doc. No. 31.) Accordingly, the pending motion for partial summary judgment is fully briefed and ripe for disposition. This case is currently scheduled for trial in July 2018.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v.

5

Zenith Radio Corp., 475 U.S. 574, 586 (1986). Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III. DISCUSSION

### A. Legal Standard Applicable to Claims of Negligent Infliction of Emotional Distress

In Pennsylvania, courts have limited negligent infliction of emotional distress ("NIED"), claims to four particular factual situations: (1) the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff suffered a physical impact; (3) the plaintiff was in a "zone of danger," at risk of an immediate physical injury; or (4) the plaintiff had a contemporaneous observation of a tortious injury to a close relative. Doe v. Phila. Cmty. Health Alts. AIDS Task Force, 745 A.2d 25, 27 (Pa. Super. Ct. 2000), aff'd, 767 A.2d 548 (Pa. 2001). According to the briefing of the parties, the first and fourth theories of NIED liability are potentially at issue in this case.

With regard to the first factual scenario, NIED claims are limited to existing relationships that involve "duties that obviously and objectively hold the potential of deep emotional harm in the event of breach." Toney v. Chester Cty. Hosp., 36 A.3d 83, 95 (Pa. 2011). In Toney, an evenly divided Pennsylvania Supreme Court affirmed the Superior Court's denial of defendant's motion to dismiss plaintiff's allegations of negligent infliction of emotional distress on the basis that, in the absence of physical impact or injury, such a claim can be maintained "only in those cases where there exists a special relationship where it is foreseeable that a breach of the relevant duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress." Id. at 84. The justices who favored affirmance concluded that such claims are limited to relationships accepted by the defendant, usually by contractual

agreement. Id. at 92. The court articulated examples of such special relationships as including care of a deceased body, childbirth, and the doctor-patient relationship. Id. at 92-93.

With regard to the fourth factual scenario, also known as the "bystander rule," a NIED claim may exist where a plaintiff is located near the scene of the trauma, the shock resulted from direct emotional impact upon the plaintiff from the observation of the trauma, and the plaintiff and victim were closely related. Sinn v. Burd, 404 A.2d 672, 685 (Pa. 1979) (quotation omitted). Pennsylvania courts have interpreted the observation element to require that a "plaintiff must have observed the defendant traumatically inflicting the harm on the plaintiff's relative, with no buffer of time or space to soften the blow." Bloom v. Dubois Reg'l Med. Ctr., 597 A.2d 671, 682 (Pa. Super. Ct. 1991). Under this theory, a plaintiff has the burden to demonstrate that he or she observed a traumatic infliction of injury to the relative, not just the aftermath or effects. See Halliday v. Beltz, 514 A.2d 906, 908 (Pa. Super. Ct. 1986) (finding that complaint's allegations that a decedent's husband and daughter were in the hospital during her operation but did not personally observe the decedent's surgery or the postoperative emergency measures employed on her behalf failed to meet the pleading requirements of a negligent infliction of emotional distress claim). Accordingly, "[a] person who does not experience a sensory and contemporaneous observance of the injury does not state a cause of action for negligent infliction of emotional distress." Love v. Cramer, 606 A.2d 1175, 1177 (Pa. Super. Ct. 1992).[3]

---

[3] The Pennsylvania Superior Court has permitted recovery under a negligent infliction of emotional distress theory where a Plaintiff did not <u>visually</u> observe the infliction of negligent harm, but rather <u>heard</u> a crash from inside a store, recognizing that "sensory and contemporaneous observance" is not limited to visual sensory perception. Krysmalski by Krysmalski v. Tarasovich, 622 A.2d 298, 304 (Pa. Super. Ct. 1993), appeal denied, 636 A.2d 634 (Pa. 1993).

### B. Plaintiff's Claim for Negligent Infliction of Emotional Distress

Plaintiff maintains that both the first and fourth factual scenarios described above apply here and that she has adduced sufficient evidence from which a reasonable factfinder could conclude that she has established a NIED claim. (Doc. No. 30-5 at 4-8.) The Medical Center argues that the first scenario is simply inapplicable to this case pursuant to Toney, as it applies to situations where the defendant has a special relationship with a plaintiff such that an implied duty to care for the plaintiff's well-being exists. (Doc. No. 31 at 6.) The Medical Center points out that Plaintiff fails to point to any case law finding a special relationship to exist between a medical provider and a patient's spouse, and further argues that because Plaintiff fails to point to evidence showing that the Medical Center owed a duty of care to her regarding her emotional well-being, Plaintiff's NIED claim based on the special relationship theory must fail. (Doc. No. 31 at 10.)

Upon review of the briefs of the parties, the relevant authorities, and the evidence of record, the Court is persuaded by the Medical Center's argument. The first factual scenario permitting a claim for negligent infliction of emotional distress – the existence of a special relationship – is not a viable legal theory under which Plaintiff can pursue an NIED claim, as she fails to point to any evidence from which a reasonable factfinder could conclude that a special relationship existed between herself and the Medical Center. See Freedman v. Fisher, No. 13-3145, 2014 U.S. Dist. LEXIS 139226, at *6-*7 (E.D. Pa. Oct. 1, 2014) (finding no special relationship between the patient's wife and the hospital or any of its doctors, such that a duty was owed to the wife, and explaining that "a doctor's duty is to the patient and not to the concerned or worried relative. . . There is no suggestion that a relative's claim should derive from the duty to the patient").

The Court next turns to the Medical Center's argument that Plaintiff fails to point to evidence sufficient to persuade a reasonable factfinder that she observed the infliction of any injury to Mr. Vargas under the fourth factual scenario – the bystander theory – necessitating the entry of summary judgment on her NIED claim. (Doc. No. 29 at 14-17.) The Medical Center points out that Plaintiff was not present for either of the procedures performed on Mr. Vargas on December 2, 2014, learning afterwards that the GI Service believed that Mr. Vargas's GI bleed was caused by stomach ulcers. (Doc. No. 29 at 15.) Accordingly, the Medical Center maintains that the undisputed facts of this case demonstrate that Plaintiff did not observe Medical Center staff engaging in any traumatic infliction of harm to Mr. Vargas. (Id. at 16.) The Medical Center acknowledges that while there are some circumstances where Pennsylvania courts have recognized that a plaintiff's observation of a negligent omission in the healthcare context may support a NIED claim, it argues that the relevant case law makes a distinction between observation of an omission, or the refusal or lack of care, and observation of an effort to provide care that is ultimately unsuccessful. (Doc. No. 31 at 14-15.)

For example, as to the refusal or lack of care, in Love, supra, the Superior Court reinstated a NIED claim where a plaintiff requested tests for her mother which were refused, after which she observed her mother's fatal heart attack. Love, 606 A.2d at 1177. See also Turner v. Med. Ctr., 686 A.2d 830 (Pa. Super. Ct. 1997) (finding that a plaintiff who observed a hospital's failure to respond to requests for assistance, resulting in the necessity of the plaintiff assisting in the delivery of her sister's stillborn baby, witnessed the infliction of negligent harm); Kroposky v. Luis De La Fuente, M.D., No. 10-cv-703, 2011 Pa. Dist. & Cnty. Dec. LEXIS 598, at *17 (C.C.P. Lackawanna Cty. Mar. 11, 2011) (finding that plaintiff stated a NIED claim under the bystander theory where she complained to the defendant about her child's respiratory

distress, but he failed to take action and allowed the child's condition to worsen). However, in Leblanc v. Willis, No. 08-c-6324, 2012 Pa. Dist. & Cnty. Dec. LEXIS 310, at *22 (C.C.P. Lehigh Cty. June 27, 2012), the court granted summary judgment to defendants on a NIED claim, finding that plaintiffs failed to demonstrate negligent infliction of emotional distress where the defendants displayed a concerted attempt to treat the plaintiffs' family member. The court in that case distinguished a refusal to treat (which might constitute a traumatic infliction of harm), from an attempt to treat, explaining:

> The fact that in hindsight such treatment might ultimately be viewed as little more than a concatenation of errors nevertheless cannot transform a bona fide attempt to render assistance into the sort of discrete traumatic event, analogous to an automobile accident or fire, which remains a prerequisite for recovery. By contrast, the latter category of traumatic event might readily be said to exist when a family member implores for help and, in the disregard of duty and with the foreseeable result of not only peril to the afflicted but emotional injury to the family member seeking aid, a healthcare provider merely turns a cold shoulder.

Id. at *23.

Here, in opposition to the Medical Center's motion, Plaintiff argues that she was present for the Medical Center's negligent diagnosis that Mr. Vargas's GI bleed was caused by stomach ulcers, and that she was told that it was fine for her husband to fly from Pennsylvania to Florida after his discharge. (Doc. No. 30-5 at 8.) However, as to the first point, the Medical Center correctly notes that Plaintiff has pointed to no evidence suggesting that she recognized a failure to act at any time during Mr. Vargas's hospital stay or urged treatment for Mr. Vargas that was refused, as in Love, Turner, and Kroposky. Moreover, as to the second point, the Medical Center notes that Plaintiff's deposition testimony, offered in opposition to the Medical Center's motion,

does not contain evidence of a representation to her by the Medical Center that it was safe for Mr. Vargas to fly. (See Doc. No. 30-3.)[4]

Accordingly, upon review of the briefs of the parties, the relevant authorities and the evidence of record, the Court concludes that Plaintiff has failed to point to evidence from which a reasonable factfinder could conclude that Plaintiff contemporaneously observed the infliction of harm on her husband, through a negligent act or omission on the part of the Medical Center, sufficient to support a NIED claim under the bystander theory.

**IV. CONCLUSION**

For all of the reasons discussed above, the Court will grant the Medical Center's motion for partial summary judgment. An appropriate Order follows.

---

[4] The relevant deposition testimony pertaining to Plaintiff's discussion with Medical Center personnel regarding the discharge of Mr. Vargas is as follows:
Q     Did you – did you talk to the nurse who was –
A     Yes.
Q     Tell me what you remember about that discussion?
A     She told me that as soon as we got back home that I was to contact our doctors and followup with them and let them know what had happened.
Q     Do you remember anything else about talking with her?
A     She said that he was – she was – she was – she was putting in a prescription for him to take for the pain and that he was to no longer take any other type of pain medication, especially over-the-counter.
Q     Anything else that you remember?
A     She was happy that we were going to be able to – to leave and make our flight.
Q     Anything else?
A     That's it.
…
Q     Did you – by the way, do you remember the name of the nurse?
A     No. I'm sorry.
Q     Did – did you talk with any – any physicians that day, December 3rd?
A     No.
Q     Did you ask to talk with any of the physicians?
A     No.
(Doc. No. 30-3 at 16.)